## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SOUNDEXCHANGE, INC. | Civil Action No. |
| Plaintiff, | **COMPLAINT** |
| v. | TRIAL BY JURY DEMANDED |
| SIRIUS XM RADIO INC. | |
| Defendant. | |

Plaintiff SoundExchange, Inc. ("SoundExchange" or "Plaintiff"), by and through its attorneys, for its Complaint against Defendant Sirius XM Radio Inc. ("Sirius XM" or "Defendant"), alleges, on personal knowledge as to matters relating to itself and on information and belief as to all other matters, as set forth below.

## <u>NATURE OF THE ACTION</u>

1.      Sirius XM has exploited the creative efforts of recording artists without paying legally mandated compensation.  Sirius XM has received ample and repeated opportunity to pay what it owes, but it has steadfastly refused.  As a result, this lawsuit is necessary to recover substantial overdue royalties and late fees required by the Copyright Act and to prevent the underpayment of royalties going forward.

2.      Sirius XM's flagship product is its satellite digital audio radio service, known in the applicable federal regulations as "SDARS."  Sirius XM's SDARS delivers music via satellite to specialized radio devices.  Sirius XM provides the only SDARS in the country, driving the lion's share of the company's $9 billion in annual revenue.

1

3.      In recent years, Sirius XM has expanded its business to include a webcasting product.  Sirius XM's webcasting service transmits audio over the internet to any internet-connected device via streaming.  Unlike its SDARS, where Sirius XM is the only provider of such a service, many companies offer webcasting across a range of different platforms.

4.      The Copyright Act affords Sirius XM the benefit of a statutory license to use copyrighted sound recordings.  The license is subject to certain requirements, with which Sirius XM purports to comply for its SDARS and its webcasting activities.  Within the scope of the statutory license, Sirius XM can digitally transmit any sound recording that has ever been commercially released to its 34 million paying subscribers without fear of infringing copyright.  Federal law grants this authority to all eligible services, and copyright holders cannot withhold the license.  But the statutory license is not free: the Copyright Act requires Sirius XM to pay royalties for the use of copyright owners' valuable original content.  By regulation, Sirius XM must pay those royalties to SoundExchange, a non-profit organization that collects digital performance and related royalties and distributes them to artists and copyright owners.

5.      Sirius XM is not entitled to deprive music creators of the full amount of royalties it rightfully owes to them under federal law.  Yet Sirius XM has not paid its bills.  By purporting to comply with the statutory license without paying what it owes under the license, Sirius XM has unjustly enriched itself to the detriment of recording artists and copyright owners upon whose music Sirius XM has built its business.  As described below, and to be further adduced in discovery, Sirius XM's improper conduct complained of herein falls into two separate categories.

6.      ***First***, To promote its economic interests, Sirius XM no longer sells its SDARS as a standalone product.  Rather, Sirius XM sells its SDARS only as part of a product bundle that also includes its webcasting service.  Sirius XM is gaming the system: to grossly underpay the

royalties it owes, Sirius XM has unreasonably characterized revenue from its bundled product as "webcasting revenue" that in actuality is "SDARS revenue." Sirius XM's revenue apportionment is beyond the pale, and harms music creators.

7.      By regulation, when Sirius XM calculates the royalties it owes for the use of sound recordings on its SDARS, it can exclude from the SDARS revenue base any revenues Sirius XM earns from webcasting. 37 C.F.R. § 382.22(b)(7)(iv). The sole purpose of this exclusion is to prevent double counting revenue for the SDARS royalty when Sirius XM is already paying a different royalty on that revenue. In other words, pursuant to the statutory license with which it purports to comply, Sirius XM is obligated to pay both SDARS royalties and webcasting royalties. But, by regulation, Sirius XM may exclude from the revenue base for SDARS royalties the revenue, if any, that is attributable to its webcasting service rather than to its SDARS.

8.      When calculating the royalties it owes for the use of sound recordings in its SDARS/webcasting bundled product, Sirius XM artificially inflates the value of its webcasting—a service that is similar to dozens of other products and for which Sirius XM charges no additional fee—in an effort to circumvent the SDARS royalty structure. Sirius XM's apportionment goes far beyond avoiding the double-payment of paying multiple royalties on the same revenue and flouts the undeniable truth that its webcasting service produces minimal marginal revenue (at best) when bundled with its SDARS. To date, Sirius XM already has unjustifiably withheld more than $150 million in royalties owed to artists and copyright owners under the SDARS statutory license.

9.      Sirius XM's webcasting subscriptions do not constitute a material part of its subscriber base, as Sirius XM itself has acknowledged. Sirius XM has repeatedly given its

3

webcasting service to existing SDARS subscribers for free.  Because Sirius XM was deriving *zero* additional marginal revenue from these SDARS subscribers due to webcasting, it should have allocated only minimal additional revenue to webcasting, if any.  Further, Sirius XM has been decreasing its prices for its webcasting-only service while increasing its prices for satellite/webcasting bundles.  That price adjustment reflects that the relative value of webcasting was decreasing.  Yet when it comes to calculating payment of royalties for its SDARS, Sirius XM significantly and continuously has increased its allocation of revenue to webcasting.

10.     Through its contrived and improper apportionment, Sirius XM has engineered a windfall for itself and deprived artists of the important compensation to which they are legally entitled and desperately need.  Indeed, the royalties Sirius XM has withheld by excluding purported webcasting revenue from its SDARS royalty calculation exceed its payments to SoundExchange under the separate webcasting license by millions of dollars per month.

11.     **_Second_**, Sirius XM has improperly rejected the results of an independent audit of its royalty payments for the 2018 calendar year that found Sirius XM had underpaid millions of dollars in royalties.  Regulations allow SoundExchange to have an independent auditor determine whether Sirius XM has properly paid the royalties it owes.  37 C.F.R. §§ 380.6(a), 382.7(a).  Those regulations state that such an audit "shall serve as an acceptable verification procedure for all parties . . . ."  37 C.F.R. §§ 380.6(d), 382.7(d).  The regulations further provide that, "[i]f the auditor determines [Sirius XM] underpaid royalties, [Sirius XM] **_shall remit_** the amount of any underpayment determined by the auditor to [SoundExchange].  37 C.F.R. §§ 380.6(g), 382.7(g) (emphasis added).

12.     Pursuant to those regulations, in September 2022, Adeptus Partners, LLC ("Adeptus" or the "Auditor") completed an independent audit of Sirius XM's royalty payments

for the 2018 calendar year.  Adeptus's audit concluded that Sirius XM had underpaid its royalties.  Without justification, Sirius XM has refused to pay the amounts the Auditor determined it owes.

13.     Music is the foundation of Sirius XM's business.  Yet, with respect to the specific activity complained of herein, Sirius XM has refused to pay the full amount it rightfully owes to music creators for its use of their creative works to drive its business.  Sirius XM's refusal to pay creators as required by law undermines the creation of new music and the ability of artists to earn a living from their craft.  Efforts to resolve this dispute without litigation have failed. Accordingly, Sirius XM must be required to pay what it owes under the statutory license, plus late fees, costs, and attorneys' fees, and be enjoined prospectively from applying its specious methodology for excluding webcasting revenue.  In addition, Sirius XM must pay the amounts the Auditor has determined it has underpaid for 2018, plus interest.

## THE PARTIES

14.     Plaintiff SoundExchange, Inc. is an independent nonprofit organization organized and existing under the laws of the State of Delaware, with its headquarters at 733 10th Street, N.W., 10th Floor, Washington, DC 20001.  The Copyright Royalty Board ("CRB") has designated SoundExchange as the sole entity in the United States to collect digital performance royalties from statutory license users and to distribute those royalties to artists and copyright owners.  Specifically, SoundExchange is charged with administering the statutory license, 17 U.S.C. § 114(e)(1); 37 C.F.R. §§ 380.4, 380.7, 382.1, collecting and distributing statutory royalties, 17 U.S.C. § 114(e)(1); 37 C.F.R. § 380.4, and enforcing the terms of the statutory license.  17 U.S.C. § 114(g)(3).  Pursuant to this authority, SoundExchange collects statutory

royalties from satellite radio, Internet radio, cable TV music channels, and other types of services that transmit sound recordings, and distributes those royalties to artists and record companies.

15.     Defendant Sirius XM Radio Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1221 Avenue of the Americas, 35th Floor, New York, NY 10020.

## JURISDICTION AND VENUE

16.     This is a civil action seeking damages and injunctive relief under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*

17.     This Court has original subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, *et seq*., and 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

18.     This Court has personal jurisdiction over Sirius XM pursuant to Va. Code Ann. § 8.01-328.1 because Sirius XM has substantial contacts with Virginia, including regularly transacting business in Virginia, contracting to supply services in Virginia, and deriving substantial revenue from operations in Virginia.  Specifically, Sirius XM has thousands of customers in Virginia to whom it sells and delivers its SDARS and its webcasting services on a subscription basis and generates revenue on which Sirius XM owes royalties to SoundExchange. Sirius XM has used servers in Virginia to deliver its webcasting service to customers in Virginia. Sirius XM also seeks out customers in Virginia including via marketing, advertising, and commercial arrangements directed toward Virginia customers.  For instance, Sirius XM has agreements with nearly all major automakers to offer Sirius XM's satellite radios as a factory-installed feature in new vehicles sold or leased in Virginia.  SoundExchange's claims in suit arise, in part, from these contacts, and potentially others, that Sirius XM has with Virginia.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(a), as Sirius XM may be found in this District, including at least because Sirius XM is subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

**I.      Sirius XM has unreasonably allocated revenue to webcasting.**

### A. The Statutory Framework for the Licensing of Digital Performance Rights.

20.     Section 106 of the Copyright Act grants the owner of a copyright in a sound recording the exclusive right to reproduce the recording and perform it "publicly by means of a digital audio transmission."  17 U.S.C. § 106(1), (6).

21.     In turn, Congress granted various noninteractive digital music services, including an SDARS like Sirius XM's, the opportunity to obtain a "statutory license," 17 U.S.C. §§ 112, 114(d)(2), to transmit digital public performances of copyrighted sound recordings and make ephemeral recordings required to facilitate those transmissions.  When acting within the scope of the statutory license, Sirius XM can publicly perform all sound recordings ever released by transmitting them to its 34 million paying subscribers without fear of copyright infringement. Copyright owners cannot withhold this statutory license, which enables Sirius XM to transmit sound recordings and pay the statutory royalty without negotiating a separate license with each rightsholder, as would otherwise be necessary.

22.     The federal statutory license, however, is not free.  Rather, in the event that copyright owners and an SDARS provider are unable to agree on the license's royalty rates and terms, the Copyright Act requires the CRB to "determine reasonable rates and terms of royalty payments" for the statutory license.  17 U.S.C. § 114(f)(1)(A).  The Copyright Act provides that the rates the CRB sets "shall . . . be binding on all copyright owners of sound recordings and entities performing sound recordings," including Sirius XM.  *Id.* § 114(f)(1)(B).

23.     Sirius XM has elected to be bound by the statutory license by filing the required Notice of Use of Sound Recordings with the United States Copyright Office.  As a licensee relying upon the statutory license set forth in 17 U.S.C. §§ 112(e) and 114, Sirius XM must comply with the requirements of 17 U.S.C. §§ 112(e) and 114 and 37 C.F.R. §§ 382 (for its SDARS) and 380 (for its webcasting service).

24.     SoundExchange is the sole entity designated by the CRB to collect and distribute statutory royalties.  37 C.F.R. § 382.5(d)(1).  Accordingly, Sirius XM owes its statutory royalty fees to SoundExchange.

25.     For the period of January 1, 2018, to December 31, 2027, the statutory royalty rate for SDARS is "15.5% of Gross Revenues."  37 C.F.R. § 382.21(a).

26.     The CRB has defined Gross Revenues to include all revenue recognized by a statutory licensee in accordance with GAAP from the operation of an SDARS.  37 C.F.R. § 382.22(a).  Ten categories are expressly excluded from the definition of "Gross Revenues," including, as relevant here, revenues recognized by the statutory licensee for "[c]hannels, programming, products and/or other services for which the performance of sound recordings and/or the making of Ephemeral Recordings is exempt from any license requirement or is separately licensed, including by a statutory license and, for the avoidance of doubt, webcasting . . . ."  37 C.F.R. § 382.22(b)(7)(iv).

27.     The CRB has stated that its definition of Gross Revenue "unambiguously relates the fee to the value of the sound recording performance rights at issue [in the SDARS license]." Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services (*SDARS I*), 73 Fed. Reg. 4080, 4087 (Jan. 24, 2008).

28.     The CRB has separately set the royalty fees associated with commercial webcasters under the statutory license.  Unlike for an SDARS, royalties for webcasting are calculated on a per-performance basis rather than as a percentage of gross revenues: the webcasting royalty is assessed for each transmission of a sound recording to a listener, while the SDARS royalty is assessed as a percentage of the revenues the service generates.  *See* 37 C.F.R. § 380.10(a) (setting webcasting royalty rates).  This differential treatment results in part from differences in the technologies; satellite radio services have historically been incapable of monitoring how many listeners hear each transmission of a recording, while webcasting applications can do so.  For the year 2023, the statutory royalty rate for commercial webcasters is "$0.0030 per Performance for subscription services and $0.0024 per Performance for nonsubscription services."  *Id.*

29.     The CRB has ruled that the webcasting exclusion "does not afford Sirius XM unfettered discretion" over how it allocates revenue.  Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services (Ruling on Referred Questions), 82 Fed. Reg. 56725, 56731 (Nov. 30, 2017).  The CRB has clarified that "if GAAP applies, the proper legal result is wholly dependent upon the proper accounting treatment under GAAP."  *Id.*  In the absence of specifically applicable GAAP principles, as appears to be the case here, "a standard of reasonableness should prevail."  *Id.*  To be reasonable, Sirius XM's allocation must "provide[] a faithful representation of the facts" that is "free of error . . . to the extent possible," and is "precise" and "reasonably accurate."  *Id.* at 56731-32.  Sirius XM's webcasting revenue allocation flunks this standard.

**B. Sirius XM allocated revenue to webcasting without any basis in fact regarding the value or usage of its services.**

30.     Sirius XM has three main subscription offerings: (1) Music Showcase, (2) Music & Entertainment, and (3) Platinum.[1]  Prior to July 2019, each offering included Sirius XM's SDARS, but only the Platinum package included webcasting.  In July 2019, Sirius XM added webcasting services to its Music & Entertainment package.  In September 2020, Sirius XM added webcasting to its Music Showcase package.

31.     Prior to October 2021, Sirius XM excluded $2.50 per Platinum subscription from Gross Revenue as attributable to its webcasting.  Sirius XM calculated this exclusion by using the difference in price between the Platinum subscription (which included webcasting) and the Music & Entertainment subscription (which until July 2019 did not).  Specifically, Sirius XM attributed half of the $5 price difference between these plans to webcasting and half to additional, premium channels offered only with the Platinum package.

32.     This 50/50 split appears to have been entirely arbitrary, and therefore unreasonably failed to "provide a faithful representation of the facts."  Sirius XM has not offered any justification for allocating half of the difference in price between the Platinum and Music & Entertainment packages to webcasting.  Sirius XM has not pointed to any facts or data about its customers' purchasing behavior or usage of satellite radio and webcasting services that could justify this 50/50 split.

33.     In October 2021, Sirius XM abruptly changed course.  On October 11, 2021, Sirius XM informed SoundExchange that, beginning with its October 15, 2021 royalty payment, Sirius XM would begin excluding at least 17.8% of its SDARS Gross Revenue as attributable to

---

[1] "Platinum" used to be known as "All Access"; "Music & Entertainment" used to be known as "Select"; and "Music Showcase" used to be known as "Mostly Music."  To avoid confusion, the Complaint uses the current names for these products retroactively.

its separately licensed webcasting service.  Sirius XM stated that it attributed this revenue to webcasting based on a private survey Sirius XM had conducted.  As part of increasing this exclusion, Sirius XM began excluding 20.8% of self-pay Platinum revenue, or $3.18 per subscription based on the then-current average revenue per Platinum user, an increase of more than 27% for that product.  In October 2022, Sirius XM increased its revenue exclusions even further; for example, it increased the exclusion to 25.2% for self-pay Platinum subscribers, an increase of 21% over the rate it had adopted just a year earlier, and an increase of 54% over the exclusion it had been using prior to October 2021.

34.     These dramatic increases in the revenue Sirius XM allocated to webcasting were improper.  As explained below, they defy the purpose of the exclusion, ignore Sirius XM's actual business practice, and rely on patently unreasonable surveys.  They are Sirius XM's cynical attempt to avoid paying the royalties it plainly owes.

**C. Sirius XM's exclusion of webcasting revenue unreasonably far exceeds that necessary to avoid double-counting.**

35.     The purpose of the webcasting exclusion is to prevent double-counting revenue for which Sirius XM is already paying a different royalty, not to provide Sirius XM a windfall.  The CRB has observed in a similar context that the "separately licensed" exclusion is necessary because "[t]o do otherwise would effectively result in a double payment . . . ."  Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services (*SDARS II*), 78 Fed. Reg. 23054, 23080 (Apr. 17, 2013).

36.     The royalties Sirius XM has withheld by excluding revenue under the webcasting exclusion far exceed the royalties Sirius XM has paid for webcasting, resulting in a windfall to Sirius XM.

**D. The pricing history for Sirius XM's products conflicts with Sirius XM's allocations of revenue to webcasting both before and after October 2021.**

37.     Sirius XM's allocation methods do not accurately account for how much its customers would pay for webcasting and satellite radio separately.  When determining its exclusion of webcasting revenue, Sirius XM made no attempt to analyze how its customers' purchasing behavior for webcasting and satellite radio would change in response to changes in price—what economists call elasticity of demand.  The difference in elasticity of demand matters because it indicates the comparative value of each component marketed collectively in a bundle, which consequently indicates how much of the revenue should be attributed to each component. If customers are more price-sensitive with regard to one product in a bundle than another—in other words, if demand for one of the products is more elastic—then more of the bundle's revenue should properly be attributed to the less price-sensitive, less demand-elastic product.

38.     For this reason, the CRB has emphasized the importance of "willingness to pay" when allocating revenue from a bundled product.  In addressing allocating revenue among products sold together in a single bundle, the CRB has stated that, "[w]hen the input suppl[i]er, as here, is paid as a percent of retail revenue, and the bundled revenue consists of some revenue attributable to the royalty base and other revenue excluded from the royalty base, the economic indeterminacy of the revenue attributable to each bucket creates a measurement problem, absent further information regarding the [willingness to pay] of buyers/subscribers to the bundle." Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and ''Preexisting'' Subscription Services (*SDARS III*), 83 Fed. Reg. 65210, 65264 (Dec. 19, 2018).  This "willingness to pay" for Sirius XM's SDARS as compared to its webcasting bears directly on fairly allocating value between the two products in a bundled service.  It is a critical concept when determining a reasonable revenue exclusion for webcasting.

39.     Sirius XM's history of pricing its products reveals that its customers have a much higher willingness to pay for satellite radio than for webcasting.  When Sirius XM added webcasting to its Music & Entertainment package in July 2019, it did not increase the price for that package.  Sirius XM's then-CEO Jim Meyers told investors it would add webcasting services to its Music & Entertainment "at no extra charge" to those subscribers.  *Sirius XM Holdings Inc (SIRI) Q1 2019 Earnings Call Transcript*, THE MOTLEY FOOL (Apr. 24, 2019), https://www.fool.com/earnings/call-transcripts/2019/04/24/sirius-xm-holdings-inc-siri-q1-2019-earnings-call.aspx.  Similarly, the September 2020 addition of webcasting to the Music Showcase package was not accompanied by a contemporaneous price increase.  Current Sirius XM CEO Jennifer Witz confirmed that "[t]ens of millions of Sirius XM [Music & Entertainment] subscribers now get access to Sirius XM outside the car, and the many benefits of the Sirius XM app, ***at no additional cost***."  *SiriusXM Unveils Major Upgrade to Streaming Experience with New Channels, Personalization Powered by Pandora, and Expanded Video; Streaming Now Included for 30 Million Subscribers Beyond the Car*, SIRIUS XM (July 10, 2019), https://investor.siriusxm.com/news-events/press-releases/detail/1039/siriusxm-unveils-major-upgrade-to-streaming-experience-with (emphasis added).

40.     The lack of any immediate price increase indicates that Sirius XM's customers' willingness to pay for webcasting was minimal.  As the CRB has observed, "[f]rom an economic perspective increased listening by a respondent to a service to which a respondent already subscribes is marginally 'free,' because there is no increase in cost to access" that service.  *SDARS III*, 83 Fed. Reg. 65210-01.  Accordingly, any revenue attributed to webcasting for purposes of the webcasting exclusion should also be minimal.

41.     Sirius XM still advertises streaming as a "free" add-on to an SDARS subscription. For example, when advertising Platinum trial subscriptions on its website, Sirius XM tells prospective customers: "Listen to SiriusXM at home on tons of connected devices you already own—*it's free* and included in your trial subscription." *Welcome to Your Platinum Trial Subscription*, Sɪʀɪᴜs XM, https://www.siriusxm.com/trial-benefits, (last viewed May 19, 2023). (emphasis added).

42.     Sirius XM has maintained a $5 price difference between its Platinum and Music & Entertainment packages since November 2017, despite adding webcasting to its Music & Entertainment package.  From November 2017 to July 2019—when the Platinum package included webcasting while the Music & Entertainment package did not—the difference in price was $5.  Since July 2019—when both the Platinum package and the Music & Entertainment package include webcasting—the difference in price is still $5.  Adding webcasting to the Music & Entertainment package in July 2019 resulted in no change to its price, relative to the Platinum package.

43.     Before July 2019, when the Platinum package included webcasting while the Music & Entertainment package did not, Sirius XM allocated half the difference in price between the Platinum and Music & Entertainment packages to webcasting.  From July 2019 through October 2021, when both the Platinum and Music & Entertainment packages included webcasting, Sirius XM still allocated half the difference in price between the Platinum and Music & Entertainment packages to webcasting.  Even if the original 50/50 split were justified (and it was not), there was no justification for continuing with the same allocation to webcasting once both the Platinum and Music & Entertainment packages included webcasting.

14

44.     Significantly, Sirius XM has cut the prices of its webcasting-only services since 2017 while steadily increasing the prices of its packages that bundle satellite radio and webcasting services together.  The audio webcasting market is highly competitive, with dozens of providers—such as iHeartMedia, Pandora.com, Audacy, Cumulus Media, Inc., Hubbard Broadcasting, Inc., and others—offering similar, generally undifferentiated products.  By contrast, Sirius XM's SDARS is the only service in the satellite radio market.  Sirius XM's SDARS offers a unique functionality and reaches a distinct market segment, whereas its webcasting service must compete against many similar alternatives.  Additionally, Sirius XM has stated that its satellite radio and webcasting services target different customer demographics: webcasting subscribers are "generally younger and more diverse . . . ." *Sirius XM Holdings Inc (SIRI) Q4 2022 Earnings Call Transcript*, THE MOTLEY FOOL (Feb. 2, 2023), https://www.fool.com/earnings/call-transcripts/2023/02/02/sirius-xm-siri-q4-2022-earnings-call-transcript/.

45.     This competition for a different target market has forced Sirius XM to compete by reducing its prices for its webcasting service.  For example, the price of Sirius XM's webcasting-only Platinum plan decreased from $15.99 per month for approximately 264 available channels in 2017 to $10.99 per month for over 425 channels in 2023, a 31.3% price decrease despite offering 60% more channels.  That the marketplace has forced Sirius XM to lower its prices for webcasting-only packages indicates that demand for Sirius XM's webcasting is more elastic than demand for Sirius XM's satellite radio service.  Indeed, Sirius XM's CEO, Jennifer Witz, stated in 2022 that Sirius XM's "prices on the digital side are a little lower because we are looking to go after a slightly more price-sensitive market." *Sirius XM Holdings Inc. (SIRI) CEO Jennifer Witz Presents at Bank of America Media, Communications & Entertainment Conference 2022*

*(Transcript)*, SEEKING ALPHA (Sept. 7, 2022), https://seekingalpha.com/article/4539569-sirius-xm-holdings-inc-siri-ceo-jennifer-witz-presents-bank-of-america-media-communications.

46.     While Sirius XM has lowered its prices for webcasting-only packages, it has increased its prices for bundled packages that include both satellite radio and webcasting.  Sirius XM's history of lowering its webcasting-only prices while raising its prices for the satellite radio/webcasting bundle overwhelmingly shows that Sirius XM's customers value satellite radio much more than webcasting and that demand for satellite radio is far less elastic than demand for webcasting.

47.     As Sirius XM's customers' willingness to pay for webcasting falls behind while their willingness to pay for satellite radio grows, the allocation of revenue from the satellite radio/webcasting bundle to webcasting should accordingly move in the same direction.  Ignoring its own pricing actions and marketplace realities, Sirius XM has done the exact opposite and allocated increasingly large amounts of bundled-subscription revenue to the lower-value webcasting service.

**E.  Sirius XM's reliance on its constant sum surveys to allocate revenue to webcasting post-October 2021 is not reasonable.**

48.     To try to justify its radical increase in its exclusion percentages, Sirius XM claims it relied on a survey it conducted of approximately 10,000 subscribers.  According to Sirius XM, it used a "constant sum" survey to attempt to determine the relative value its subscribers placed on satellite radio versus webcasting services and thereby allocate revenue between the two.  A "constant sum" survey is a type of stated-preference market research survey that asks respondents to allocate a constant sum of points or units (usually 100) between specified criteria, services, or features based on the relative value respondents place on the specified features.

According to Sirius XM's first survey, its subscribers attributed 17.8% of the value of their subscriptions to webcasting services.

49.     Sirius XM subsequently conducted a second survey that it claims yielded an even higher webcasting revenue exclusion.  On October 17, 2022, Sirius XM informed SoundExchange that it had conducted a second survey of approximately 15,000 respondents that, according to Sirius XM, found its subscribers valued its webcasting services even more than the 2021 survey had found.  Sirius XM stated it would increase its webcasting revenue exclusions based on the results of the 2022 survey as follows: 19.7% for Music & Entertainment (up from 16.0%); 25.2% for self-pay Platinum subscribers (up from 20.5%); 20.7% for Platinum paid trial subscriptions[2] (up from 13.2%); and 16.4% for Music Showcase (up from 13.8%).[3]  The result of these changes was a further underpayment of over $2 million per month compared to the October 2021 method.  Apart from having conducted a new survey, Sirius XM has not offered any explanation for how its customers' behavior changed from 2021 to 2022 to require substantially increasing its exclusions so quickly.  The significant differences between the two surveys conducted only a year apart call into question the reliability of both surveys' results.

50.     Sirius XM could have used actual usage data to quantify how much its subscribers use its SDARS versus its webcasting service.  Apart from any potentially relevant internal data Sirius XM has, third-party vendors also independently measure usage.  Sirius XM's attempt to pay royalties based entirely on the self-serving surveys it concocted—while ignoring actual usage data, failing to assess willingness to pay, not doing a meaningful

---

[2] Consumers purchasing or leasing a vehicle with a factory-installed satellite radio may receive a limited-time trial subscription to Sirius XM, which is often prepaid by the applicable automaker.
[3] While Sirius XM has informed SoundExchange that the weighted average rate for the first survey across all products was 17.8%, Sirius XM has not provided a similar metric for the second survey, and SoundExchange does not possess the data to calculate that metric itself.

econometric analysis, and disregarding its own marketplace conduct—is patently unreasonable. In fact, the CRB has previously rejected the relevance of a survey that does not measure willingness to pay, stating: "[A] survey that asks 'listeners' to rank substitute services without providing price information fails to provide any meaningful information as to how those 'listeners' will act as 'consumers' of [the services being ranked]." Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (*Web IV*), 81 Fed. Reg. 26316, 26327 (May 2, 2016).

51.     In addition, Sirius XM has not provided SoundExchange with either the survey instruments showing the wording and order of the questions asked or the raw survey data. This prevents evaluation of the surveys and flouts the concept of "transparency" that the CRB indicated was critical to any reasonable apportionment methodology. For example, Sirius XM has not explained how it defined "value" in instructing respondents to allocate "value" between streaming and non-streaming services. Sirius XM also appears to have discarded approximately 1,000 of the 10,000 responses in its first survey for supposed "quality control" reasons and has not provided the criteria it used to discard responses or explained the effect excluding these responses had on the survey results.

52.     Sirius XM's surveys demand close scrutiny. The CRB regularly refuses to rely on surveys with methodological flaws or that conflict with industry practices and data. For example, the CRB refused to rely on a "seriously flawed" survey because the survey failed to ask about all relevant marketplace alternatives and therefore "fails to depict the marketplace reality." *SDARS III*, 83 Fed. Reg. 65210; *see also* Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies To Facilitate Those

Performances (*Web V*), 86 Fed. Reg. 59452 (Oct. 27, 2021) (finding survey question "unduly biased" and methodological choices "troubling—and ultimately unreasonable").

53.     What limited information Sirius XM has provided reveals basic flaws in its survey's methodology.  For instance, Sirius XM's survey found that 42% of respondents who admitted that they essentially never use streaming somehow still assigned value to streaming. Yet Sirius XM relied on that finding to allocate subscriber revenue to webcasting and then underpay what it owes.

**F.  Sirius XM must remit the overdue royalty payments plus pay late fees.**

54.     The CRB requires SDARS providers like Sirius XM who have elected to take a statutory license to make an advance royalty payment on January 31 of each year.  37 C.F.R. § 382.3(b).  SDARS providers must make additional royalty payments on a monthly basis, with monthly payments "due on or before the 45th day after the end of the [relevant] month."  37 C.F.R. § 382.3(d).  These payments must be made to SoundExchange.  37 C.F.R. § 382.3(a).

55.     In the event of untimely payments, an SDARS provider "must pay a late fee for each payment and each Statement of Account that [SoundExchange] receives after the due date. The late fee is 1.5% (or the highest lawful rate, whichever is lower) of the late payment amount per month."  37 C.F.R. § 382.3(e).  The CRB has stipulated that "[l]ate fees accrue from the due date until the date that [SoundExchange] receives the late payment or late Statement of Account."  *Id.*  Similar provisions have been in effect since the 2007-2012 rate period.

56.     Sirius XM has repeatedly failed to make timely royalty payments (or has timely paid only a portion of the royalty payments it owes).  Sirius XM must remit the overdue royalty payments plus late fees.

## II.    Sirius XM has failed to pay royalties an independent auditor has determined it owes to SoundExchange.

57.    CRB regulations empower SoundExchange to verify the payments it is entitled to receive from Sirius XM via an independent audit once per year.  37 C.F.R. §§ 380.6(a)-(b), 382.7(a)-(b).  The audit must be conducted by a "Certified Public Accountant independent within the meaning of the American Institute of Certified Public Accountants Code of Professional Conduct."  37 C.F.R. § 382.1.  "An audit of books and records, including underlying paperwork, performed in the ordinary course of business according to generally accepted auditing standards by a Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit."  37 C.F.R. §§ 380.6(d), 382.7(d).  If the auditor determines Sirius XM has underpaid royalties, Sirius XM "shall remit the amount of any underpayment determined by the auditor to [SoundExchange] . . . ."  37 C.F.R. §§ 380.6(g), 382.7(g).

58.    On July 29, 2019, SoundExchange filed with the CRB a notice of intent to audit Sirius XM's "Commercial Webcaster service, Preexisting Satellite Digital Audio Radio Service, New Subscription Service, and Business Establishment Service for transmissions terminating in the United States for the year 2018."  *Notice of Intent to Audit*, 84 Fed. Reg. 45175, 45176 (Aug. 28, 2019).

59.    Pursuant to that notice, Adeptus conducted an audit of Sirius XM's royalty payments for the 2018 calendar year.

60.    On September 6, 2022, after reviewing its tentative findings with Sirius XM, Adeptus issued its final audit report.  Adeptus's audit report cited several categories of underpayment.

20

61.     Adeptus also found that Sirius XM owed interest on the royalties Adeptus
determined Sirius XM owed but had failed to pay.

62.     Adeptus concluded that Sirius XM had underpaid its royalties for the 2018
calendar year, as relevant here, by millions of dollars.  To date, Sirius XM has agreed that it
owes only roughly 3% of that amount and refuses to pay the rest.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of 37 C.F.R § 382.21(a) and 17 U.S.C. § 114(f)(1)(B)—Underpayment Based on Exclusion of Revenue

63.     SoundExchange incorporates by reference paragraphs 1 to 62 as if fully set forth
herein.

64.     The Copyright Act provides a statutory license for the digital performance rights
in sound recordings and the making of ephemeral reproductions to facilitate the licensee's
performance of those recordings.  17 U.S.C. §§ 112, 114.  Because Sirius XM has chosen to rely
on that statutory license, it must make royalty payments to SoundExchange at the rates and on
the terms set by the CRB.  37 C.F.R. § 382.21(a); *see also* 17 U.S.C. § 114(f)(1)(B).

65.     Sirius XM's payments to SoundExchange for its SDARS are calculated as a
percentage of Sirius XM's Gross Revenues, a term defined in 37 C.F.R. § 382.22.  Sirius XM
has excluded from its reported Gross Revenues an amount that it attributes to revenues from
webcasting.  Sirius XM's methods for attributing revenues to webcasting in order to exclude
them from its SDARS Gross Revenues are not reasonable, as the CRB requires, Determination of
Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio
Services (Ruling on Referred Questions), 82 Fed. Reg. 56725, 56731 (Nov. 30, 2017).  These
unreasonable reductions in SDARS Gross Revenues have reduced the amounts that Sirius XM

paid to SoundExchange under the terms of the federal statutory license.  The unreasonable reductions in Gross Revenues, and consequent underpayments, contravene the requirement that "a Licensee must pay royalty fees for all Eligible Transmissions of sound recordings" to SoundExchange, 37 C.F.R. § 382.21(a), and the Copyright Act's statement that the CRB-determined rates are "binding on . . . entities performing sound recordings" during the period when the rates are in effect, 17 U.S.C. § 114(f)(1)(B).

66.    Additionally, because Sirius XM has not paid the full royalties it owes to SoundExchange on a timely basis, it must pay late fees on the unpaid amounts.  37 C.F.R. § 382.3(e).  Sirius XM has not paid such late fees to SoundExchange.

67.    Sirius XM has wrongfully withheld royalties and late fees that the CRB's regulations require it to pay and continues to improperly withhold millions of dollars every passing month.

### SECOND CAUSE OF ACTION
### Violation of 37 C.F.R §§ 380.6(g) and 382.7(g)—Failure to Remit the Amount of Underpayment Determined by an Auditor

68.    SoundExchange incorporates by reference paragraphs 1 to 62 as if fully set forth herein.

69.    The Copyright Act provides a statutory license for the digital performance rights in sound recordings and the making of ephemeral reproductions to facilitate the licensee's performance of those recordings.  17 U.S.C. §§ 112, 114.  Because Sirius XM has chosen to rely on that statutory license, it must make royalty payments to SoundExchange at the rates and on the terms set by the CRB.  37 C.F.R. § 382.21(a); *see also* 17 U.S.C. § 114(f)(1)(B).

70.    CRB regulations entitle SoundExchange to verify the payments it is entitled to receive from Sirius XM via an independent audit once per year and provide that such an audit "shall serve as an acceptable verification procedure for all parties with respect to the information

that is within the scope of the audit."  37 C.F.R. §§ 380.6(a)-(b), (d), 382.7(a)-(b), (d).  If the

auditor determines Sirius XM has underpaid royalties, Sirius XM "shall remit the amount of any

underpayment determined by the auditor to [SoundExchange] . . . ."  37 C.F.R. §§ 380.6(g),

382.7(g).

71.     Pursuant to CRB regulations, SoundExchange initiated an independent audit of

Sirius XM's royalties for the 2018 calendar year.  The final audit report, issued on September 6,

2022, found that Sirius XM owed additional royalties and interest.

72.     Sirius XM has not paid the amounts that the audit report determined Sirius XM

owes.  Accordingly, Sirius XM has breached 37 C.F.R. § 380.6(g) and 37 C.F.R. § 382.7(g) by

failing to make all royalty payments an auditor has determined are owed under 37 C.F.R.

§ 382.21(a) and 17 U.S.C. § 114.

## **PRAYER FOR RELIEF**

WHEREFORE, SoundExchange respectfully requests a judgment in its favor and against

Sirius XM as follows:

a.  For compensatory damages arising from Sirius XM's underpayment of royalties as

required by the statutory license, as alleged in Plaintiffs' First Cause of Action, in such

amounts to be determined at trial;

b.  For compensatory damages arising from Sirius XM's failure to pay royalties that an

independent auditor has determined Sirius XM owes, as alleged in Plaintiffs' Second

Cause of Action, together with interest as provided in 37 C.F.R. § 382.7(g), in such

amounts to be determined at trial;

c.  For an injunction preventing Sirius XM from using prospectively its current method, and requiring it to use a reasonable method, for attributing revenue to webcasting for purposes of excluding webcasting revenue from its SDARS Gross Revenues;

d.  For appropriate late fees and interest, including late fees available under 37 C.F.R. § 382.3(e);

e.  For SoundExchange's costs, including reasonable attorney fees and costs pursuant to 17 U.S.C. § 505; and

f.  For any other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, SoundExchange hereby respectfully demands a jury trial on all issues so triable in this action.

Dated: August 16, 2023

OPPENHEIM + ZEBRAK, LLP

*/s/ Scott A. Zebrak*
Scott A. Zebrak (38729)
Corey Miller (*pro hac vice* motion forthcoming)
Jeff Kane (*pro hac vice* motion forthcoming)
4530 Wisconsin Avenue NW, Fifth Floor
Washington, DC 20016
Tel: 202-480-2999
scott@oandzlaw.com
corey@oandzlaw.com
jkane@oandzlaw.com

*Attorneys for Plaintiffs*