IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| SOUNDEXCHANGE, INC., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-1083 (PTG/JFA) |
| | ) | |
| SIRIUS XM RADIO, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Sirius XM Radio Inc.'s Motion to Dismiss, or in the alternative, Motion to Transfer ("Motion"). Dkt. 16. On August 16, 2023, SoundExchange, Inc. filed this action contending that Defendant underpaid royalties under the Copyright Act. Dkt. 1 ("Compl."). Defendant seeks to dismiss the Complaint for lack of personal jurisdiction and, consequently, improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3). Dkt. 16 at 1. In the alternative, Defendant has moved to have this case transferred to the Southern District of New York or the District of Columbia pursuant to 28 U.S.C. §1404(a). *Id.* For the reasons that follow, Defendant's Motion will be granted in part and denied in part.

## Factual Background

Sirius XM, a Delaware corporation with its principal place of business in New York, provides the only satellite digital audio radio service ("SDARS") in the United States. Dkt. 1 ("Compl.") ¶¶ 2, 15. The Copyright Act grants Sirius XM a statutory license to digitally broadcast copyrighted sound recordings. 17 U.S.C. §§ 112, 114(d)(2); Compl. ¶ 4. The license allows Sirius XM to digitally transmit, nationwide, any sound recording that has ever been commercially

released to its 34 million paying subscribers without fear of infringing copyrights.  Compl. ¶ 4.

However, Sirius XM must pay royalties for the use of copyright owners' original content.  *Id.*

Under the Act, Sirius XM must pay these royalties to SoundExchange.  *Id.*  The Copyright Royalty

Board ("CRB") designated SoundExchange as the sole entity in the United States to collect digital

performance royalties and distribute them to artists and copyright owners.  *Id.* ¶ 14.  Pursuant to

regulations implemented under the Copyright Act, SoundExchange is authorized to administer the

statutory license, collect and distribute royalties, and enforce the terms of the license.  *Id.* (citing

U.S.C. § 114(e)(1), (g)(3); 37 C.F.R. §§ 380.4, 380.7, 382.1).  The amount of money Sirius XM

must pay to SoundExchange for operating its SDARS is calculated "as a percentage of its 'Gross

Revenues,' a term defined in 37 C.F.R. § 382.22."[1]  *Id.* ¶ 65.  For the period of January 1, 2018 to

December 31, 2027, the statutory royalty rate for SDARS is 15.5% of Sirius XM's Gross

Revenues.  *Id.* ¶ 25.

In recent years, Sirius XM expanded its business to include a webcasting service that

transmits audio over the internet to different devices via streaming.  *Id.* ¶ 3.  Sirius XM is one of

several companies offering webcasting services in the country.  *See id.* ¶ 44.  SoundExchange

argues that, in an effort to advance its economic interests, Sirius XM now sells its SDARS to its

subscribers only as a part of a product bundle that also includes its webcasting service.  *Id.* ¶ 6.

SoundExchange alleges that on October 11, 2021, Sirius XM notified the organization that

beginning with its October 15, 2021 royalty payment, Sirius XM would begin to exclude at least

17.8% of its SDARS Gross Revenue as attributable to its webcasting service.  *Id.* ¶ 33.  Whereas

---

[1]  The regulation defines "Gross Revenues" as including subscription revenue from U.S. subscribers for the SDARS; advertising revenue or any other money Sirius XM receives from sponsors through the operation of its SDARS; and any revenue that Sirius XM is entitled to but that is paid to a parent, wholly-owned subsidiary, or division of the corporation. *See* 37 C.F.R. § 382.22(a).

royalty payments for the SDARS are based on gross revenues, royalties for webcasting are calculated on a per-performance basis which, at least for the year 2023, were set at a rate of $0.0030 per performance for subscription services and $0.0024 for non-subscription services. *Id.* ¶ 28.

According to SoundExchange, while regulations under the Copyright Act permit Sirius XM to exclude from the SDARS revenue base any revenue generated from webcasting, this exclusion rule simply serves to prevent double counting of revenue on which Sirius XM already paid a royalty amount. *Id.* ¶ 7. SoundExchange argues that in violation of these regulations, Sirius XM is inflating the value of its webcasting service to circumvent the amount of money it owes in royalties under the SDARS. *Id.* ¶ 8. SoundExchange further contends that by bundling its webcasting service with its SDARS, Sirius XM has been able to "grossly underpay the royalties that it owes" by unreasonably characterizing revenue generated from the "bundled product as 'webcasting revenue' that in actuality is 'SDARS revenue.'" *Id.* ¶ 6. SoundExchange argues that this method of calculating royalties is unreasonable given the fact that in recent years (due to the stark competition in webcasting services), Sirius XM has been forced to decrease the price of its webcasting only packages while simultaneously increasing the price of its bundle packages, which is the only way that customers can access the SDARS. *Id.* ¶¶ 45–46. SoundExchange alleges that, to date, Sirius XM has unjustifiably withheld more than $150 million in royalties under its SDARS statutory license. *Id.* ¶ 8. Accordingly, SoundExchange has sued Sirius XM, accusing it of underpaying royalty amounts in violation of 37 C.F.R. § 382.21(a) and 17 U.S.C. § 114(f)(1)(B). *Id.* ¶¶ 63–67.

SoundExchange also accuses Sirius XM of violating 37 C.F.R. §§ 380.6(g) and 382.7(g) by failing to remit the amount of royalties an independent auditor determined Sirius XM underpaid to artists and copyright owners. *Id.* ¶¶ 68–72. Regulations under the Copyright Act allow

3

SoundExchange to have an independent auditor determine whether Sirius XM has properly paid royalties that it owes; and if the auditor determines that the corporation has underpaid royalties, then Sirius XM must remit the amount of underpaid royalties to SoundExchange. *Id.* ¶ 11 (citing 37 C.F.R. §§ 380.6, 382.7). SoundExchange alleges that pursuant to these regulations, in September 2022, Adeptus Partners, LLC ("Adeptus") completed an audit of Sirius XM's royalty payments for the 2018 calendar year and determined that Sirius XM has underpaid its royalties by millions of dollars. *Id.* ¶ 12. SoundExchange asserts that, to date, Sirius XM acknowledges only 3% of the amount of money Adeptus claims it owes and refuses to pay the rest. *Id.* ¶ 62.

SoundExchange filed its Complaint on August 16, 2023. Compl. In the Complaint, SoundExchange asserted the following basis for this Court's exercise of basis personal jurisdiction:

> This Court has personal jurisdiction over Sirius XM pursuant to Va. Code Ann. §
> 8.01-328.1 because Sirius XM has substantial contacts with Virginia, including
> regularly transacting business in Virginia, contracting to supply services in
> Virginia, and deriving substantial revenue from operations in Virginia.
> Specifically, Sirius XM has thousands of customers in Virginia to whom it sells
> and delivers its SDARS and its webcasting services on a subscription basis and
> generates revenue on which Sirius XM owes royalties to SoundExchange. Sirius
> XM has used servers in Virginia to deliver its webcasting service to customers in
> Virginia. Sirius XM also seeks out customers in Virginia including via marketing,
> advertising, and commercial arrangements directed toward Virginia customers. …
> SoundExchange's claims in suit arise, in part, from these contacts, and potentially
> others, that Sirius XM has with Virginia.

*Id.* ¶ 18. On September 22, 2023, Sirius XM moved to dismiss this civil action for lack of personal jurisdiction, or in the alternative, to have this case transferred to the Southern District of New York or the District Court for the District of Columbia for convenience and in the interest of justice. *See* Dkts. 16, 17. On October 26, 2023, the Court heard argument on Sirius XM's Motion. *See* Dkt. 28. This matter is now ripe for resolution.

## Legal Standard

### A.   Dismissal Under Rule 12(b)(2) for Lack of Jurisdiction

Under Fed. R. Civ. P. 12(b)(2), "a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016).  When the court conducts an evidentiary hearing, the plaintiff must establish that personal jurisdiction is proper by a preponderance of the evidence. *Id.* at 268 ("[A]n 'evidentiary hearing' requires only that the district court afford the parties a fair opportunity to present both the relevant jurisdictional evidence and their legal arguments.").  If, in the absence of an evidentiary hearing, the district court reviews "only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint," then the plaintiff need only make a *prima facie* showing of personal jurisdiction to survive a motion to dismiss under Rule 12(b)(2). *Id.*  "[T]he court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

### B.   Transfer of Venue Pursuant to 28 U.S.C. §1404(a)[2]

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought[.]" 28

---

[2] On April 29, 2024, Plaintiff filed a Motion for Leave to File a Notice of Supplemental Authority ("Motion for Leave"). Dkt. 30.  In the Motion for Leave, Plaintiff seeks permission to file a notice of supplemental authority, contending a recent decision from the United States District Court for the Western District of North Carolina further clarifies "the proper standard of review for a motion to transfer in the Fourth Circuit." *Id.*; *see also* Dkt. 30-1 at 1 (citing *Doe v. Univ. of N. Carolina Sys.*, No. 1:23-cv-00041, 2024 WL 925549 (W.D.N.C. Mar. 4, 2024)).  On May 1, 2024, Defendant filed on opposition to Plaintiff's Motion for Leave. Dkt. 32.  Although Plaintiff's proposed supplemental authority does not aid the Court in its consideration of the instant matter, the Court will nevertheless grant Plaintiff's Motion for Leave (Dkt. 30).

U.S.C. § 1404(a). "[I]n considering whether to transfer venue, a district court must make two inquiries: (1) whether the claims might have been brought in the transferee forum, and (2) whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum." *Koh v. Microtek Int'l, Inc.*, 250 F. Supp. 3d 627, 630 (E.D. Va. 2003). The party seeking transfer generally "bears the burden of proving 'that the circumstances of the case are *strongly* in favor of transfer.'" *Heinz Kettler GMBH & Co. v. Razor USA, LLC*, 750 F. Supp. 2d 660, 667 (E.D. Va. 2010) (citation omitted). However, "the ultimate decision [of whether to transfer a case] is committed to the sound discretion of the district court." *Pragmatus AV, LLC v. Facebook, Inc.*, 769 F. Supp. 2d 991, 994 (E.D. Va. 2011); *see also In re Ralston Purina Co.*, 726 F.2d 1002, 1005 (4th Cir. 1984).

## Analysis

### I.     This Court Has Specific Personal Jurisdiction over Defendant Sirius XM

A court may exercise personal jurisdiction over a defendant only if "(1) such jurisdiction is authorized by the long-arm statute of the state in which the district court sits; and (2) application of the relevant long-arm statute is consistent with the Due Process Clause." *Universal Leather, LLC v. Koro Ar, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014). Virginia's long-arm statute permits personal jurisdiction to the fullest extent allowed by due process. *See* Va. Code Ann. § 8.01-328.1; *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009). "Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009).

Specific personal jurisdiction over a defendant can be exercised where the defendant has "purposefully established minimum contacts in the forum State" such "that [it] should reasonably

anticipate being haled into court there."[3] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (internal quotation marks and citations omitted). The Fourth Circuit has synthesized the due process requirements for asserting specific personal jurisdiction in a three-part test in which a court considers "(1) the extent to which the defendant 'purposefully availed' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *ALS Scan, Inc.*, 293 F.3d at 712 (cleaned up) (quoting *Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 216 (4th Cir. 2001)).

Here, Sirius XM concedes that it has purposefully availed itself of the privilege of conducting business in Virginia by way of delivering satellite radio and webcasting services to its subscribers in Virginia.[4] Dkt. 17 at 11. However, Defendant maintains that the other two prongs of the personal jurisdiction inquiry are not satisfied in this case to establish that the exercise of personal jurisdiction is consistent with either Virginia's long-arm statute or the Due Process Clause. *See id.* at 10–11. For the reasons that follow, the Court disagrees.

A.    *Plaintiff's Claims Against Defendant Arise from Defendant's In-State Activities*

Virginia's long-arm statute provides, in relevant part, that a court "may exercise personal jurisdiction over a person . . . as to a cause of action arising from the person[] . . . [t]ransacting any

---

[3] Generally, personal jurisdiction under the Due Process Clause can exist as either general or specific jurisdiction. *ALS Scan, Inc. v. Digit. Serv. Consultants, Inc.*, 293 F.3d 707, 711 (4th Cir. 2002). The parties in this case agree that there is no general jurisdiction over Sirius XM in Virginia; instead, they dispute whether this Court has specific jurisdiction over Defendant. *See* Dkt. 17 at 17 ("There is no general personal jurisdiction over Sirius XM[.]"); Dkt. 24 at 4 (Plaintiff contends that this Court has specific, not general, jurisdiction over Defendant).

[4] Plaintiff argues that Defendant's contacts with Virginia are not just limited to providing satellite and webcasting services to its subscribers in the forum state, but they also include Sirius XM's collection of fees (which generates revenue) from its subscribers in Virginia as well as Defendant's underpayment of royalties to Virginian artists and rightsholders. Dkt. 24 at 7.

business in this Commonwealth[;] [c]ontracting to supply services or things in this Commonwealth[;] or causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if [the person] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth[.]" Va. Code Ann. §§ 8.01-328.1(A)(1), (A)(2), (A)(4). Virginia courts have held that the phrase "arising from" in Section 8.01-328.1 "requir[es] that there be a causal link between the acts relied on for personal jurisdiction and the claims detailed in the complaint." *Selke v. Germanwings GmbH*, 261 F. Supp. 3d 645, 656 (E.D. Va. 2017) (first citing *Chedid v. Boardwalk Regency Corp.*, 756 F. Supp. 941, 943 (E.D. Va. 1991); then citing *Verosol B.V. v. Hunter Douglas, Inc.*, 806 F. Supp. 582, 589 (E.D. Va. 1992)). "However, the causation contemplated by the statute requires more than bare 'but for' causation; instead, the connection between forum contacts and the cause of action must rise to the level of legal or proximate causation." *Id.* (citing *Chedid*, 756 F. Supp. at 943). The Fourth Circuit has further articulated the "arising from" (or out of) prong of the personal jurisdiction inquiry, holding that the prong is satisfied when the defendant's activities "in the forum state is 'the genesis of [the] dispute'" such that these in-state activities "'form[] a central part of [the plaintiff's] claims.'" *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 354–55 (4th Cir. 2020) (quoting *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 303, 306 (4th Cir. 2012)).

The parties in this case offer different viewpoints on the true nature of the Complaint and whether Plaintiff's claims arise from Defendants contacts with the forum state. Defendant argues that Plaintiff's claims are "premised on national-level business decisions and conduct that occurred exclusively in other states." Dkt. 17 at 12 (citing *Medina v. Melon One, Inc.*, No. 18-cv-1603, 2019 WL 13252421, at *2 (E.D. Va. Jun. 10, 2019)). Defendant contends that while it may be

true that Sirius XM's in-state commercial activities include providing revenue-generating subscription services to its Virginia customers, at the heart of the Complaint is a dispute over "Sirius XM's revenue apportionment and royalty calculations"—which were decided in Defendant's New York headquarters—and "royalties paid on nationwide sales (here, subscriptions)." *Id.* at 13–14. Thus, according to Defendant, because Plaintiff's claims could exist independent of Sirius XM's Virginia sales and customers, these claims only have an attenuated relation to, rather than arise from, Defendant's contacts with the forum state. *Id.* at 14.

In opposition, Plaintiff asserts that its claims against Defendant for alleged violations of the Copyright Act do, in fact, arise from Defendant's in-state activities. According to Plaintiff, Sirius XM, through its commercial activities, generates millions of dollars in revenue each month from its approximately one million Virginian subscribers alone. Dkt. 24 at 3. Plaintiff maintains that because Sirius XM generates revenue from the forum state and has a legal obligation to appropriately calculate a portion of this revenue as royalty payment to artists and rightsholders, including to at least 5,000 individuals in Virginia, Defendant's contacts with the forum state form the genesis of the Complaint. *See id.* at 5–7, 11. Plaintiff argues that the mere fact that Defendant engages in the same conduct in other states besides Virginia does not, and should not, defeat this Court's exercise of personal jurisdiction. *Id.* at 9.

In considering the parties' arguments and the relevant legal authority, the Court finds that Plaintiff's claims arise from Defendant's contacts with Virginia. In particular, the Court finds the *Selke* decision on point. 261 F. Supp. 3d 645. In *Selke*, the plaintiffs sued three airlines over the deaths of the plaintiffs' family members resulting from a plane crash in the French Alps. *Id.* at 649, 651. One of the defending airlines moved to dismiss the plaintiffs' complaint for lack of personal jurisdiction, arguing, at least in part, that the plaintiffs' cause of action arose from the

plane crash and not the defendant's contacts in Virginia. *Id.* at 656. The court disagreed, finding instead that the defendant's business activity of authorizing one of the other defending airlines to sell plane tickets to citizens in the forum state gave rise to the plaintiffs' cause of action. *Id.* at 657. Specifically, the court found that the selling of these tickets, which led to the decedents obtaining passage to the plane that crashed, formed the catalyst of the plaintiff's cause of action. *Id.* According to the court, the plane crash did not "sever the causal nexus between the act of selling the tickets and [the p]laintiffs' cause of action," and it was the selling of the tickets that was the proximate cause of the plaintiffs' claim. *Id.*

Here, in this instant action, Defendant maintains that it cannot be said that Defendant's contacts with Virginia are the cause of Plaintiff's suit because Sirius XM's methodology for apportioning its revenue was developed in its corporate headquarters in New York, and not in the forum state. *See* Dkt. 25 at 4. To an extent, the Court agrees with Defendant that Plaintiff's Complaint is based on a dispute over Defendant's revenue apportionment methodology. However, the Court finds that, like the plane crash in *Selke*, Defendant's methodology is better understood as the but-for causation of Plaintiff's causes of action. In contrast, the revenue that Defendant generates, at least in part, through its in-state activities is the proximate cause of Plaintiff's claims and establishes, for personal jurisdiction purposes, that such claims arise from Defendant's contacts with the forum state.

Plaintiff alleges, and Defendant does not dispute, that Sirius XM's business contacts with Virginia include the continuous and systematic act of providing SDARS and webcasting services to in-state residents from whom Defendant generates revenue. *See* Dkt. 24 at 12–13. Under federal law, Defendant must apportion a certain amount of this revenue to pay royalties that Plaintiff then distributes to artists and copyright owners around the country, including those who reside in

Virginia. Plaintiff's Complaint challenges Defendant's apportionment of revenue derived from the royalty-generating services that Defendant purposefully directs to the forum state. Thus, without the revenue that Defendant has derived through its provision of royalty-generating services to its customers in Virginia and elsewhere, there would be no actualization of Defendant's revenue apportionment methodology. Considered in this light, the methodology is the but-for cause of Plaintiff's claims, but like the selling of the plane ticket in *Selke*, Defendant's revenue-generating activities in the forum state form the catalyst or proximate cause of Plaintiff's claims. Accordingly, the Court finds that Plaintiff's claims arise from Defendant's in-forum business activities and the second prong of the personal jurisdiction analysis is satisfied.

The instant case is also analogous to the Fourth Circuit's decision in *UMG Recordings*, which further supports finding that the second prong of the personal jurisdiction inquiry is satisfied here. *See* 963 F.3d 344. In *UMG Recordings*, the Fourth Circuit reversed a decision to dismiss a case for lack of personal jurisdiction involving a foreign defendant, who operated two websites, entirely from Russia, through which users obtained copy-infringing sound recordings. *Id.* at 349. The Fourth Circuit recognized that the plaintiffs' claims of copyright infringement were not just limited to the defendant's activities in Virginia, but instead spanned the entire country. Nevertheless, the Court found that the claims arose out of the defendant's in-state activities because a large number of Virginian visitors (who made up only 2% of the websites' global visitors) used the defendant's websites, the defendant was aware of this, and the defendant was able to sell these visitors' data to advertisers to generate a profit. *Id.* at 354–55. Accordingly, the Court found that there was an affiliation between defendant's contacts in Virginia and the underlying controversy and that the defendant's contacts formed the genesis of the dispute. *Id.* at 355.

Like the *UMG Recordings* defendant, Sirius XM has purposefully directed its revenue-generating services at the forum state, and through its business activities, Sirius XM derives a profit from in-state residents who pay monthly subscriptions to access these services. Virginia subscribers account for approximately 3% of Sirius XM's 34 million total subscribers. *See* Dkt. 17 at 23. According to Plaintiff, the amount of revenue Sirius XM generates from Virginia subscribers alone is substantial and could amount to approximately $14-24 million per month. Dkt. 24 at 3. As noted earlier, Plaintiff alleges that Defendant has grossly and unreasonably apportioned its total gross revenue as revenue derived from its webcasting service, instead of the SDARS, to reduce the amount of royalties Defendant must pay to both Virginian and non-Virginian artists and copyright owners alike. *See id.* at 3–4, 6–7. This total revenue undoubtedly includes the revenue generated from the forum state. Thus, the Court finds that, like in *UMG Recordings*, there is an affiliation between Defendant's in-state activities, and the underlying controversy and these activities form the genesis of Plaintiff's Complaint, satisfying the second prong required to establish personal jurisdiction.

Defendant tries to distinguish *UMG Recordings* on the grounds that unlike this instant action, *UMG Recordings* involved an actual claim of copyright infringement and not merely a dispute over compliance with copyright regulations. Dkt. 25 at 3–4. The Court does not find that this distinction is significant to the analysis. While it is true that this instant action does not involve a claim of copyright infringement, the Court nevertheless finds that under both Virginia's long-arm statute and the Due Process Clause, the underlying controversy in this case does arise from Defendant's contacts with the forum state.

The Court is also not persuaded by Defendant's reliance on *Matlin v. Spin Master Corp.*, 921 F.3d 701 (7th Cir. 2019), and *Worldwide Subsidy Group, LLC* v. *Federation International de*

12

*Football Ass'n*, 2014 WL 12631652 (C.D. Cal. June 9, 2014), in support of its claim that Defendant's contacts with Virginia do not form the genesis of Plaintiff's Complaint. *See* Dkt. 17 at 12–14. While both cases involved disputes over royalty payments, and the respective court in each case dismissed the action for lack of personal jurisdiction, the Court finds that the two cases are easily distinguishable from the instant action. For instance, the *Matlin* plaintiff's invocation of personal jurisdiction was predominately based on a single online purchase of the alleged royalty-generating product that the plaintiffs' attorney made in an impermissible attempt to establish jurisdiction. 921 F.3d at 707. In contrast, in this case, Defendant's in-state activities involve the continuous and systematic act of providing SDARS and webcasting services to in-state residents from whom Defendant generates revenue. For a similar reason, *Worldwide Subsidy Group* is also distinguishable because in that case, the in-state activities at issue were five soccer matches. 2014 WL 12631652, at \*10. Five soccer matches are a very limited number of contacts with the forum state which is vastly different from the continuous business activities Sirius XM conducts here in Virginia.

In sum, the Court finds that in this case, Plaintiff seeks to challenge (1) Defendant's apportionment of revenue derived from royalty-generating services that Defendant purposefully directs to the forum state, and (2) Defendant's alleged underpayment of royalties to individuals entitled to these payments, including those who reside in the forum state. Therefore, Plaintiff's claims arise from Defendant's in-forum activities. Accordingly, the Court finds that Plaintiff has satisfied the second prong of the personal jurisdiction inquiry.

*B.*     *The Exercise of Personal Jurisdiction over Defendant is Constitutionally Reasonable*

The final question concerning personal jurisdiction in this case is whether the exercise of jurisdiction over Defendant is constitutionally reasonable. In evaluating this prong, courts

13

consider the following factors: "[1] the burden on the defendant[;] [2] the court's ability to conveniently and efficiently resolve the dispute[;] [3] the interest of the forum state in adjudicating the dispute[;] [4] the plaintiff's interest in obtaining effective relief[;] and [5] the interests of the state in furthering substantive policies." *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 135 (4th Cir. 2022). This prong seeks to ensure that a defendant is not haled into court in the forum state unless it is "reasonably foreseeable that the defendant could be subject to suit there." *CFA Inst.*, 551 F.3d at 296.

The Court finds that the exercise of personal jurisdiction over Defendant would be constitutionally reasonable. Here, in support of its Motion, Defendant argues that Washington, D.C. is a convenient forum for this civil action. *See* Dkt. 17 at 20, 25. Given the close proximity between Defendant's articulated venue of choice and the instant one, the Court does not find that litigating the case in this venue would unduly burden Defendant or its potential witnesses. Furthermore, the Court finds that because Sirius XM is a large corporation that directs considerable business activities to the forum state, and Defendant admits to enjoying the privileges of conducting business in Virginia,[5] it was reasonably foreseeable for Defendant to be haled into court in Virginia. For these reasons, and those discussed above, this Court may exercise personal jurisdiction over Defendant.[6]

---

[5] Defendant also admits that it has five Virginia-based employees who work at one of its warehouse logistic facilities located in the forum state. *See* Dkt. 17 at 4 n.1.

[6] Since the Court has personal jurisdiction over Defendant, venue is also proper because under the Copyright Act, venue is proper wherever a defendant "may be found." *See* 28 U.S.C. § 1400(a).

**II.     The Southern District of New York is a More Appropriate and Convenient Venue for This Civil Action**

In the alternative, Defendant argues that even if this Court finds that it has personal jurisdiction over Defendant, the Court should transfer venue to the Southern District of New York or the District of Columbia pursuant to 28 U.S.C. 1404(a). Dkt. 17 at 18.

As noted above, "in considering whether to transfer venue, a district court must make two inquiries: (1) whether the claims might have been brought in the transferee forum, and (2) whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum." *Koh*, 250 F. Supp. 2d at 630. As to the second inquiry, in determining whether the interest of justice and convenience of the parties and witnesses warrants transfer, courts commonly consider: "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015). Here, the parties do not disagree that this case could have been brought in either New York or Washington, D.C. *See* Dkt. 24 at 18; Dkt. 25 at 9. Instead, the parties disagree as to whether, under § 1404(a), the circumstances of this case favor transferring the case to another venue in the interest of justice and convenience.

Although this Court, for the reasons explained above, has specific personal jurisdiction over Defendant, the Court finds that the interests of justice and convenience of the parties and potential witnesses warrants transferring this case to the Southern District of New York. First, the Court finds that Plaintiff's choice to file this civil action in this forum is not entitled to the substantial weight generally afforded to a plaintiff's choice of forum because SoundExchange is neither based in the forum state nor does it raise causes of action that bear a strong relation to this forum. *See JTH Tax, Inc. v. Lee*, 482 F. Supp. 2d 731, 736 (E.D. Va. 2007) (explaining that a

"'(p)laintiff's choice of venue is entitled to substantial weight, unless plaintiff chooses a foreign forum and the cause of action bears little or no relation to that forum.'" (quoting *Hanover Ins. Co. v. Paint City Contractors, Inc.,* 299 F. Supp. 2d 554, 556 (E.D. Va. 2004)).  Plaintiff, a Delaware corporation with its principal place of business in the District of Columbia, lacks any direct relationship to the forum state as it is not based here.

While the Court finds, for personal jurisdiction purposes, that Plaintiff's claims against Defendant do arise out of Defendant's activities in Virginia, the Complaint's factual allegations largely stem from events and decisions made in New York.  Plaintiff's first cause of action against Defendant—for alleged underpayment of royalty amounts pursuant to the Copyright Act—is based on conduct that occurred at Defendant's New York corporate headquarters, where Sirius XM developed and applied its royalty apportionment methodology. *See generally* Compl. at 10–19, 21.  Similarly, Plaintiff's second cause of action—failure to remit unpaid royalties found by an independent auditor—is predicated on a 2022 audit of Defendant's 2018 royalty payments that Adeptus, a New York company, performed at Sirius XM's corporate headquarters. *See id.* 20–21, 23.

Additionally, the Court finds that consideration of the convenience of the parties and potential witnesses weigh in favor of transferring this case.  First, the Court is doubtful that this forum is more convenient for either party when neither are domiciled in the forum state and, as explained above, most of the events and disputed actions underlying the Complaint occurred elsewhere, primarily in New York.  Moreover, while Plaintiff asserts that it anticipates calling as witnesses individuals who reside in the "DMV," most of the potential witnesses identified by both Plaintiff and Defendant are located outside of the forum state. *See* Dkt. 24 at 20–22; Dkt. 25 at 12.  Furthermore, Plaintiff concedes that "most of the fact witnesses will be employes of one of

the two parties." Dkt. 25 at 22. This fact undermines Plaintiff's argument that this forum is the most appropriate venue for this civil action. In short, the Court finds that, taken as a whole, the § 1404(a) factors support transferring this case to the Southern District of New York because the events and actions underlying the Complaint took place in New York; few, if any, of the potential key witnesses in this case reside in Virginia; and the parties themselves are not based in the forum state.[7] Accordingly, it is hereby

**ORDERED** that Defendant's Motion (Dkt. 16) is **DENIED IN PART** and **GRANTED IN PART**. The Motion is **DENIED** as to the motion to dismiss for lack of personal jurisdiction and improper venue. The Motion is **GRANTED** as to the motion to transfer; it is further

**ORDERED** that Plaintiff's Motion for Leave to File a Notice of Supplemental Authority (Dkt. 30) is **GRANTED** such that Plaintiff's Notice of Supplemental Authority (Dkt. 30-1) is deemed filed; and it is further

**ORDERED** that this civil action be and is **TRANSFERRED** to the Southern District of New York.

Entered this 15th day of July, 2024.
Alexandria, VA

/s/
**Patricia Tolliver Giles**
**United States District Judge**

---

[7] For this reason, the Court will not address either Defendant's speculative claim that it intends to implead Adeptus as a third-party defendant or its forum-shopping allegations levied against Plaintiff. *See* Dkt. 17 at 26–27; Dkt. 25 at 13.

17